IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| SILVER BUCKMAN | : | NO. 14-540 |
| VINCENT FOXWORTH | : | |
| CYNTHIA FOXWORTH | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                            **JANUARY 8, 2019**

      Defendants were found guilty of conspiracy to commit bank fraud and wire fraud and substantive counts of bank and wire fraud. Defendants and the Government now dispute the appropriate sentencing guideline range to apply at the sentencing hearings. In particular, they dispute the applicable fraud loss amount. As discussed in more detail below, we will apply a fourteen-level enhancement for the fraud loss amount at the sentencing hearings. In accordance with Section 2B.1 of the United States Sentencing Guidelines, this enhancement corresponds to a fraud loss amount that is more than $550,000, but less than $1,500,000. In addition, the Government's request for application of additional sentencing enhancements not contemplated by the Probation Officer will be granted in part and denied in part.

**I.    BACKGROUND**

      On October 29, 2015, a jury found Defendant Silver Buckman guilty of conspiracy to commit bank fraud and wire fraud, six substantive counts of bank fraud, and five substantive counts of wire fraud. The charges and evidence centered on Buckman's orchestration of a scheme to defraud homeowners and lending institutions in lease-buyback transactions, pursuant

to which she obtained $3,787,600 in mortgages from federally insured and non-federally insured financial institutions.

## A. Procedural History

On September 30, 2014, a grand jury returned a 12-Count Indictment charging Defendants Silver Buckman, Vincent Foxworth, Cynthia Foxworth, Danette Thomas, Byron White, and Franklin Busi with crimes related to a conspiracy to commit bank and wire fraud. (Indictment, ECF No. 1.)[1] Specifically, Defendants were charged with: (1) conspiracy to commit bank and wire fraud, in violation of 18 U.S.C. § 1349; bank fraud, in violation of 18 U.S.C. § 1344; and wire fraud, in violation of 18 U.S.C. § 1343. (*Id.*)[2] The Government alleged that Defendants engaged in a scheme to defraud by making false representations to vulnerable homeowners facing foreclosure. The false representations related to Defendants' purported mortgage rescue program, under which Defendants offered homeowners the opportunity to repair their credit, or to obtain money in the form of equity, by selling their homes pursuant to a sale-leaseback arrangement. The Government also alleged that Defendants made false representations and omissions of material fact to lending institutions in furtherance of the fraudulent scheme.

Trial commenced on October 5, 2015. On October 29, 2015, after nearly four weeks of trial, the jury returned a verdict. The jury found Silver Buckman guilty on all counts. The jury found Vincent Foxworth guilty on Counts 1, 3, 4, 6 through 9, 11, and 12, and not guilty on Count 2. The Jury found Cynthia Foxworth guilty on Counts 1, 4, 9, and not guilty on Counts 2,

---

[1] In May 2015, Defendant Franklin Busi entered a negotiated guilty plea. On October 21, 2015, Busi testified as a Government witness.

[2] Count 1 charges all Defendants with conspiracy to commit bank and wire fraud. Counts 2 through 7 charge various Defendants with bank fraud, and Counts 8 through 12 charge various Defendants with wire fraud. Silver Buckman was charged on all counts.

3, and 8.  Defendants Danette Thomas and Byron White were found not guilty of all charges brought against them.  (*See* Min. Entry, ECF No. 180.)

On August 4, 2017, Defendants' motions for a new trial under Federal Rule of Criminal Procedure 33 were denied.  (ECF Nos. 260, 262.)  Defendants' sentencing hearings were originally scheduled for September 2017; however, continuances of the hearings were required for a number of reasons.  Defendants and the Government disputed the Sentencing Guideline calculations and filed numerous pleadings in support of their respective positions.  (*See* ECF Nos. 269-278.)  Defendants requested retention of a mortgage fraud expert to assist in their presentation of issues relating to calculating the fraud loss.  Finally, Defendant Silver Buckman required that new counsel be appointed.  Buckman's attorney at the time requested to withdraw after she had accepted a position with the Philadelphia District Attorney's Office.  (ECF Nos. 288, 291.)  New counsel requested time to review the issues associated with Buckman's sentencing.  (ECF No. 291.)

The sentencing hearings were rescheduled for September 20 and 21, 2018.  (ECF No. 295.)  The Government and Defendant Silver Buckman submitted supplemental memoranda in support of their respective positions regarding calculation of the Sentencing Guidelines ranges.  (ECF Nos. 298, 300.)  Defendants again sought to continue the sentencing hearings (ECF No. 299.)  The request for a continuance was granted.  (ECF No. 302.)  On September 20, 2018, the Court heard arguments by all parties about sentencing issues.  (Sept. 20 Hr'g Tr., ECF No. 306.)[3]  The sentencing of Defendants is now scheduled for January 9, 2019.

---

[3] At the hearing, the Government provided the Court with a binder of documents and charts that illustrate the Government's position with respect to calculation of loss for the purpose of sentencing Defendants.

### B. Factual Background

During the nearly four-week trial, the jury saw over 300 exhibits and heard from over fifty witnesses. The evidence established that, through Silver Buckman's company, Fresh Start Financial, numerous financially distressed homeowners were enticed to enter into lease-buyback agreements with "investors" because they were assured they would not lose title to their homes, and that their credit could be repaired. The homeowners were told they would share title to their home with the investors for a period of one year, during which time the new mortgage would be paid from escrow accounts set up during settlement. Silver Buckman's parents, Vincent Foxworth and Cynthia Foxworth, were "investors" in the conspiracy, and were paid fees for essentially serving as straw borrowers for the lease-buyback transactions. The homeowners were led to believe that they could remain in their homes through the year covered by the lease-buyback agreement and, at the end of the year, they could repurchase their home by refinancing the mortgage using the remainder of the money from escrow accounts that would be created.

The evidence showed that Buckman recruited homeowners using advertising pamphlets, and hired employees who would pitch the details to potential clients over the telephone. The homeowners were told that their equity would be placed in escrow to assist with the bridge loan; they were rarely told that investors' fees of $10,000 and settlement services fees of $5,000 would be deducted from the equity. (Oct. 26 Trial Tr. 42, 61-63, 65, 68-69, 78, 81-82; Gov't's Ex. 291.) Bank records for Fresh Start Financial and for the Foxworths confirmed that these fees were deducted from the homeowners' equity during the settlements.

The documents that were associated with the lease-buyback arrangements—including the lease-buyback contracts, the Uniform Residential Loan Applications, and the HUD-1 settlement statements—contained numerous false representations. None of the documents presented to the

lending institutions contained any reference to the lease-buyback contracts.  The lending institutions that authorized the mortgages—and at times, second mortgages—were not told and did not know that the transactions involved a lease-buyback.  (Oct. 13 Trial Tr. 68, ECF No. 236.)  Had the banks known that the transactions were lease-buybacks, or that the Foxworths were simply serving as straw borrowers, they would never have approved the mortgages.  (Oct. 13 Trial Tr. 69.)

The Government presented the testimony of the homeowners, who confirmed the role of Silver Buckman in promoting the mortgage rescue program and in falsely representing the details of the arrangement.  None of the homeowners were able to reacquire their homes after the expiration of the one-year lease-buyback arrangement.  The evidence showed that Buckman never escrowed the funds from the equity received at settlement and that all of the commingled funds that were placed in her bank accounts were depleted.

## II. DISCUSSION

The Government and Defendants dispute how to calculate the Sentencing Guidelines range applicable to Defendants.  Specifically, they dispute the fraud loss calculation.  The Government contends that the Court should take into consideration both the loss to the homeowners as well as the loss to the lenders when calculating the fraud loss amount in this case.  The Government contends that the total loss amount is more than $1.5 million but less than $3.5 million, which under the Sentencing Guidelines, results in an increase of 16 levels to the base offense level.  U.S.S.G. § 2B1.1(b)(1)(I)-(J).  Defendants rely on the opinions of their retained expert and contend that the appropriate loss amount is less than 1.5 million, which results in an increase of 14 levels to the base offense level.  *See* U.S.S.G. § 2B1.1(b)(1)(H)-(I).

In addition, the Government requests that the Court apply various sentencing enhancements under Sections 2 and 3 of the Sentencing Guidelines.

### A. Fraud Loss Calculation

Section 2B1.1 of the Sentencing Guidelines applies to Defendants' fraud offenses.[4] This section sets Defendants' base offense levels at 7. *See* U.S.S.G. § 2B1.1(a)(1) (noting that base offense level of 7 applies if the defendant was convicted of an offense that has a statutory maximum term of imprisonment of 20 or more years). Defendants do not dispute the base offense level of 7. Subsection 2B1.1(b)(1) lists enhancements to the base offense level that are dependent upon the amount of loss. Specifically, that section reads, in part:

(b) Specific Offense Characteristics:

(1) If the loss exceeded $6,500, increase the offense level as follows:

| Loss (Apply the Greatest) | Increase in Level |
|---|---|
| (A) $6,500 or less | no increase |
| (B) More than $6,500 | add **2** |
| (C) More than $15,000 | add **6** |
| . . . | |
| (H) More than $550,000 | add **14** |
| (I) More than $1,500,000 | add **16** |
| (J) More than $3,500,000 | add **18** |
| . . . . | |

U.S.S.G. § 2B1.1(b)(1).

In the Presentence Report ("PSR"), the Probation Officer calculated the applicable fraud loss as approximately $1,602,021. Based on this, he concluded that 16 levels should be added to each Defendant's base offense level because the fraud loss was more than $1,500,000 but less

---

[4] We use the 2015 Sentencing Guidelines because the Defendants were convicted in 2015. U.S.S.G. § 2B1.11.

than $3,500,000. U.S.S.G. § 2B1.1(b)(1)(I)-(J).[5] The Probation Officer arrived at this figure by calculating the loss that the lenders suffered with respect to each of the eighteen properties subject to the fraud scheme. For each property, the Probation Officer began his calculation with the mortgage or loan amount for the property. He then subtracted from that number: (1) the sale price of the property, or if the property had not yet been sold, the fair market value of the property; and (2) any mortgage payments and other amounts that Defendants paid to the lenders.

The following example illustrates how fraud loss was calculated in the PSR. The Tiffany Court Property, which was the subject of one of the lease-buyback transactions comprising the fraud scheme, was mortgaged for $328,500, in December 2006. It sold in 2010 for $187,500. After the property was mortgaged, Buckman made mortgage payments of approximately $14,543.05 on the property. Based on these numbers, the Probation Officer calculated the loss as follows:

$328,500 (loan) – 187,500 (sale price) – $14,543.05 (payments) = **$126,456.95 (loss)**

The Probation Officer performed the same calculation on each of the eighteen properties. For those properties that had not yet been sold, the Probation Officer estimated the fair market value of the properties at the time that he made the calculations. *See* U.S.S.G. § 2B1.1, Cmt. n. 3(E)(iii) (noting that "in the case of a mortgage fraud involving a mortgage loan, if the collateral has not been disposed of by the time of sentencing," loss should be calculated using the fair market value of the property at the time the defendant's guilt is established).

The Probation Officer found support for his loss calculation in the Sentencing Guidelines. In particular, he relied on Application Note 3(E) to Section 2B1.1, which provides:

---

[5] The Probation Officer calculated the sentencing guidelines range for each Defendant using Count 1, the conspiracy count. This is because all counts of which Defendants were found guilty were grouped together as "closely related counts," *see* U.S.S.G. § 3D1.2, and because the conspiracy count is the "highest offense level" applicable to the group, *see* U.S.S.G. § 3D1.3.

7

> (E) Credits Against Loss. – Loss shall be reduced by the following:
>
>> (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.

U.S.S.G. § 2B1.1, Cmt. n. 3(E)(i). Based on this guidance, the Probation Officer decreased the total loss by any mortgage payments and other payments and credits that Defendants made to the lenders. Defendants do not dispute the approach the Probation Officer used in arriving at the fraud loss amount. However, they point out that the Probation Officer simply neglected to take certain other "credits" into account when deducting credit against loss. For example, attached to Defendant Buckman's initial Sentencing Memorandum (ECF No. 269) is a chart that details payments and credits that the Probation Officer took into account. It also details additional payments and credits that the Probation Officer somehow overlooked in determining the fraud loss amount. With respect to each omitted payment, Defendant identifies the Government Trial Exhibit in which that payment or credit was referenced. For example, with respect to the Tiffany Court property, as noted above, the Probation Officer determined that Defendants made payments to lenders in the amount of $14,543.05, and credited this amount against the fraud loss. However, as Defendants point out, the trial exhibits reflect that there were additional payments made that the Probation Officer overlooked, which resulted in a total credit against fraud in the amount of $44,420.05.

Defendants submit evidence of additional payments and credits for ten of the eighteen properties subject to the fraud scheme. Based on the calculations of the Defendants, the total loss to victims was $1,455,022.26, if these overlooked payments and credits are taken into consideration. This amount results in a 14-level enhancement. U.S.S.G. § 2B1.1(b)(1). We are satisfied with the approach taken by the Probation Officer in calculating the fraud loss amount.

We are also satisfied that, had the Probation Officer been aware of these additional payments and credits represented in trial exhibits, he would have included them in the credits against fraud loss.

The Government does not dispute Defendants' submission of additional credits and payments for consideration in the fraud loss calculation. However, the Government does dispute that the total amounts of these payments should be credited toward the loss suffered by the lenders. Specifically, the Government contends that significant portions of those payments represent interest and escrow reserves, which should not be credited because they did not serve to reduce the principal amounts owed on the loans. The Government supports this argument with amortization calculators obtained from the Internet, and uses those calculators to propose the amount of principal each mortgage loan payment would have represented. The Sentencing Guidelines state that "[t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, Cmt. n. 3(C). This is because "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." *Id*. We are satisfied that crediting against the loss to lenders using the total amounts Defendants paid towards the loan best accomplishes this task.

Finally, we reject Defendants' argument that the fraud loss amount should take into consideration the fact that the economic downturn and housing crisis substantially decreased the value of the homes at the time they were sold. Defendants rely on the expert report of Ron Braver, who concluded that the total fraud loss amount should take into consideration the "Great Recession." (Braver Report 4 (on file with Court).) Determining the property value loss attributable to a recession is highly speculative. In addition, a decrease in property value is a reasonably foreseeable pecuniary harm Defendants should have known about at the time they

committed the crimes. *See* U.S.S.G. § 2B1.1, Cmt. N. 3(A)(iv) (defining reasonably foreseeable pecuniary harm as "pecuniary harm that the defendant knew of, or under the circumstances, reasonably should have known, was a potential result of the offense."); *see also United States v. Morris*, 744 F.3d 1373, 1374 (9th Cir. 2014) (rejecting argument that court should use the value of the properties at time loans were obtained in calculating fraud loss because "drastic housing market downturn of 2008-2009 was not forseeable" and noting that Sentencing Guidelines do not support such an argument); *United States v. Hymas*, 605 F. App'x 622, 624 (9th Cir. 2015) ("Nor did the court err in calculating the credit against loss, because at this stage of the analysis, a court does not take into account the market's effect on reducing the value of the collateral.").

      **B.**    **Additional Enhancements Sought by Government**

The Government requests that the Court apply various enhancements found in Chapters Two and Three of the Sentencing Guidelines. The requested enhancements were not applied by the Probation Officer in the PSR. The Probation Officer only applied two additional enhancements. Specifically, he applied the enhancement in Section 2B1.1(b)(2)(A)(i), which adds two levels if the offense involved ten or more victims. This enhancement was applied to Defendants Buckman, Vincent Foxworth, and Cynthia Foxworth. In addition, the Probation Officer applied Section 3B1.1(a) to Defendant Buckman, which increased her base offense level by an additional four levels for being an organizer/leader of the conspiracy.

Specifically, the Government requests the following additional sentencing enhancements:

(a)     Section 2B1.1(b)(2)(B), which would apply four levels to the base offense level for offenses that resulted in substantial hardship to five or more victims. The Government requests application of this enhancement to Defendants Buckman, Vincent Foxworth, and Cynthia Foxworth.

10

(b) Section 2B1.1(b)(16)(A), which would apply two levels if the defendants derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense. The Government requests that this enhancement apply to Defendant Buckman only.

(c) Section 3A.1.1(b)(1) and (2), which would apply 2 or 4 levels if the defendants knew or should have known that the victims were vulnerable. The Government requests application of this enhancement to Defendants Buckman, Vincent Foxworth, and Cynthia.

(d) Section 3B1.3, which would apply if the defendant abused a position of trust. The Government requests that this enhancement apply to Defendant Buckman only.

We will address each requested enhancement separately.

### 1. *Substantial Financial Hardship Enhancement*

Section 2B1.1(b)(2) of the Sentencing Guidelines provides:

(2) (Apply the greatest) If the offense –

(A) (i) involved 10 or more victims . . . , increase by **2** levels;
(B) resulted in substantial financial hardship to five or more victims, increase by **4** levels;

U.S.S.G. § 2B1.1(b)(2)(A)-(B). The Probation Officer applied Subsection (A) and increased each Defendant's base offense level by two since the offense involved 10 or more victims. The Government, however, believes that Subsection (B) should apply and that each Defendant's base offense level should have been increased by four levels, rather than two. The Government contends that more than five homeowners suffered substantial financial hardship as a result of Defendants' fraudulent scheme. The Government's argument confuses who constitutes the "victim" for purpose of this enhancement. The Application Notes to Section 2B1.1(b) state that

11

"'victim' means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." As was explained above, the actual loss was calculated with respect to the lenders. In particular, to determine the fraud loss amount, we subtracted the sale price or fair market value of the property and any payments and credits made on the loan from the original loan amount. The calculation assumes the victim is the lender. If we were to take into consideration loss to the homeowner, such as equity lost, then double-counting would result since loss of equity is already built into the calculation. Thus, the fraud loss amount would be improperly inflated.

We are not convinced that any institutional lender involved here suffered a substantial financial loss.[6] Nor is there any evidence in the record to support such a finding. We decline to apply the enhancement in Section 2B1.1(b)(2)(B).

    2.    *Gross Receipts of $1,000,000 or More Enhancement*

Section 2B1.1(b)(16) of the Sentencing Guidelines provides:

(Apply the greater) If –

---

[6] The notes to the Sentencing Guidelines provide that:

> In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim—
>
> **(i)** becoming insolvent;
> **(ii)** filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);
> **(iii)** suffering substantial loss of a retirement, education, or other savings or investment fund;
> **(iv)** making substantial changes to his or her employment, such as postponing his or her retirement plans;
> **(v)** making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and
> **(vi)** suffering substantial harm to his or her ability to obtain credit.

U.S.S.G. § 2B1.1, Cmt. n. 4(F). It is clear, based upon these factors, that the enhancement was intended for individual victims as opposed to institutional or corporate victims.

> (A) the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by **2** . . . .

U.S.S.G. § 2B1.1(b)(16)(A). The Government requests that the Court apply this to Defendant Buckman's base offense level. The Application Notes state that "[f]or purposes of subsection (b)(16)(A), the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts to the defendant *individually, rather than to all participants*, exceeded $1,000,000." U.S.S.G. § 2B1.1(b)(16)(A), Cmt. n. 12 (emphasis added). The evidence in the record does not support application of this enhancement. The loans were put in the names of the straw purchasers, prior mortgages were paid off, and fees were provided to the investors. Defendant Buckman controlled only the balance of the loan amounts after all these payments were made. The record simply does not support a finding that Defendant Buckman *individually* derived more than $1,000,000 in proceeds. *See United States v. Raphan*, No. 11-655, 2012 WL 6699697, at *2 (S.D.N.Y. Dec. 26, 2012) (declining to apply gross receipts enhancements for mortgage fraud scheme were the defendant did not personally obtain $1,000,000 but instead paid off existing mortgages and provided monies to co-conspirators).

### 3. *Vulnerable Victim Enhancement*

Section 3A1.1(b) of the Sentencing Guidelines provides:

(1) If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels.

(2) If (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by 2 additional levels.

U.S.S.G. § 3A1.1(b). The Government requests that a four-level enhancement under Subsection (b)(2) be applied to all Defendants. The Government contends that Defendants knew that a large

number of their victims were facing foreclosure, were elderly, were on fixed incomes, or were otherwise struggling with health issues or financial difficulties. (Gov't's Buckman Mem. 4.)

The Application Notes state that "'vulnerable victim' means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b), Cmt. n. 2. The Third Circuit employs a three-part test to determine whether a vulnerable victim enhancement is appropriate:

> The enhancement may be applied where: (1) the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated the defendant's crime in some manner; that is, there was "a nexus between the victim's vulnerability and the crime's ultimate success."

*United States v. Zats*, 298 F.3d 182, 186 (3d Cir. 2002) (quoting *United States v. Iannone*, 184 F.3d 214, 220 (3d Cir. 1999)).

The record contains evidence supporting a finding that some of Defendants' victims were vulnerable as a result of their financial difficulties. *See id.* at 188 ("Financial vulnerability is one way a victim can be otherwise particularly susceptible." (internal quotation marks and citation omitted)). Some homeowners testified that they faced foreclosure or were unable to refinance their homes due to issues with their credit. We are satisfied that the record supports application of the vulnerable victim enhancement under Section 3A1.1(b)(1) as to Defendant Buckman. This would increase Defendant Buckman's base offense level by 2.

We do not believe that the trial record supports application of this enhancement to Defendants Vincent Foxworth and Cynthia Foxworth. The victims did not testify that they had the same level of communication and interaction with the Foxworths as they did with Defendant

14

Buckman. Some of the victims had no encounter with the Foxworths until the time of settlement. There is no evidence that the Foxworths had any role in communicating with clients or in marketing the lease-buyback program. There simply is not sufficient evidence that the Foxworths knew or should have known of the victims' susceptibility or vulnerability.

We also do not believe that the Government has provided sufficient support for application of the 4-level enhancement reserved for "a large number" of vulnerable victims. The Sentencing Guidelines do not define "a large number" for purposes of this enhancement. The evidence during trial showed that eighteen properties were involved in this fraudulent scheme. We are not convinced this is the "large number" of vulnerable victims contemplated by the Sentencing Guidelines. *Compare United States v. Mooty*, 25 F. App'x 501, 501 (8th Cir.2002) ("[W]e hold that seven is not, as a matter of law, a 'large number' within the meaning of section 3A1.1(b)(2)."), *with United States v. Alvarez*, 713 F. App'x 88, 92 (3d Cir. 2017) (noting that over 150 victims of identity theft was "large number" of victims), *and United States v. Kentz*, 251 F.3d 835, 843 (9th Cir. 2001) (concluding that 300 victims of telemarketing scheme was "large number" within meaning of enhancement). In addition, the Government has not attempted to explain how each of the victim's financial distress "facilitated the defendant's crime in some manner." *Zats*, 298 F.3d at 186.

### 4. *Position of Trust Enhancement*

Section 3B1.3 of the Sentencing Guidelines provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.

U.S.S.G. § 3B1.3.

The Application Notes define "Public or Private Trust" as follows:

15

> a position of public or private trust characterized by professional or managerial discretion (*i.e*., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3, Cmt. n.1. The Application Notes also define "special skill" as a "skill not possessed by members of the general public and usually requiring substantial education, training, or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3, Cmt. n. 4.

We are satisfied that Defendant Buckman did not assume a position of public or private trust necessary to trigger application of the enhancement. She targeted victims by offering services to save their homes and their credit. But the relationship did not rise to the level of a fiduciary-like relationship. *See United States v. Douglas*, 885 F.3d 124, 133 (3d Cir. 2018). Nor was there evidence that Buckman assumed an "authoritative status" that would lead to her "actions or judgment [being] presumptively accepted." *Id*.

### III. CONCLUSION

Based on the foregoing, each Defendant's offense level will be calculated as follows.

**Silver Buckman:**
| | |
|---|---|
| Base Offense Level: | 7 |
| Ten or More Victims | + 2 |
| Fraud Loss Amount | +14 |
| Vulnerable Victim | + 2 |
| Organizer/Leader of Conspiracy | + 4 |
| Total Offense Level: | **29** |

With a criminal history category of I, this results in a guidelines range of 87-108 months.

**Vincent Foxworth:**
| | |
|---|---|
| Base Offense Level: | 7 |
| Ten or More Victims | + 2 |
| Fraud Loss Amount | +14 |
| Total Offense Level: | **23** |

With a criminal history category of I, this results in a Sentencing Guidelines range of 46-57 months.

**Cynthia Foxworth:**
| | |
|---|---|
| Base Offense Level: | 7 |
| Ten or More Victims | + 2 |
| Fraud Loss Amount | +14 |
| Total Offense Level: | **23** |

With a criminal history category of I, this results in a Sentencing Guidelines range of 46-57 months.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**